IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ROBERT HENSON, | | |
| | Plaintiff, | Civil No. 11-1809 (JBS/KMW) |
| v. | | |
| U.S. FOODSERVICE, et al., | | **OPINION** |
| | Defendants. | |

APPEARANCES:

William Riback, Esq.
Alex Schwartz, Esq.
Lauren Plevinsky, Esq.
William Riback LLC
132 Haddon Ave.
Haddonfield, NJ 08033
        Attorneys for Plaintiff Richard Henson

Karla Grossenbacher, Esq.
Taron K. Murakami, Esq.
Seyfarth Shaw LLP
975 F Street NW
Washington, DC 20004
        -and-
Alnisa S. Bell, Esq.
Seyfarth Shaw LLP
620 Eighth Avenue
New York, NY 10018
        Attorneys for Defendant U.S. Foodservice, Inc.

**SIMANDLE**, Chief Judge:

## I.    INTRODUCTION

Plaintiff Robert Henson brings this action against his

former employer Defendant U.S. Foodservice, Inc. ("US Foods")

and Defendants John Does 1-10 alleging claims for interference

and unlawful retaliation under the Family Medical Leave Act ("FMLA") and unlawful retaliation based on race and hostile work environment under the New Jersey Law Against Discrimination ("NJLAD"). This matter comes before the Court on Defendant US Foods' motion for summary judgment on all counts. [Docket Item 46.] The Court heard oral argument on November 6, 2013. US Foods' motion will be granted because US Foods had a legitimate, non-discriminatory reason for terminating Plaintiff, which has not been cast into reasonable doubt, and Plaintiff was not subjected to a racially hostile work environment.

## II. BACKGROUND

### A. Factual Background

#### a. Plaintiff's Employment with US Foods

US Foods distributes food, equipment, and related products to restaurants, hospitals, and other institutional customers. (Def. Statement of Undisputed Facts ("SOF") ¶ 1.)

Plaintiff, who is African-American, began working for US Foods on or about April 4, 2004. (Def. SOF ¶ 14.) Plaintiff worked as a Selector for US Foods' Bridgeport facility in Bridgeport, New Jersey. (Def. SOF ¶ 15.) Selectors locate food products in the warehouse and transfer them to pallets. (Def.

SOF ¶ 16.) The boxes of product on pallets can be quite heavy and are stacked quite high. (Def. SOF ¶ 20.)

"Leaning pallets," <u>i.e.</u>, pallets with product leaning to the side, must be rebuilt because they are significant safety risks. (Def. SOF ¶ 20.) Leaning pallets easily collapse, cause boxes to fall and, thus, pose a significant risk of injury. (Def. SOF ¶ 20.) Leaning pallets are also a risk to the product, which can be damaged from falling. (Def. SOF ¶ 21.) Pallets usually lean because of crushed product, which US Foods does not ship because of the risk of food spoilage or damage. (Def. SOF ¶ 21.) Customers often refuse to accept leaning pallets and delivering such pallets threatens customer relationships. (Def. SOF ¶ 21.)

Plaintiff's union shop steward, William Anthony, who is also African-American, testified that Selectors "must break [a leaning pallet] down if they're told to break it down." (Anthony Dep. 29:8-9.) Anthony also testified that he had "never" seen a supervisor instruct an employee to return a leaning pallet and bring a new one. (Anthony Dep. 29:18.) Frank Keyser, the day warehouse manager, testified that, when there is a leaning pallet, "[t]he procedure would be to rebuild the skid and rewrap the skid." (Keyser Dep. 21:16-17.)

US Foods' Selectors at its Bridgeport facility are governed
by the Rules of Conduct ("Rules"), which were negotiated by US
Foods with the Union and which were approved and signed by the
Union. (Def. SOF ¶ 9.) The Rules provide a non-exclusive list of
required discipline and standards of conduct that employees must
observe. (Def. SOF ¶ 10.) The Rules specify that certain conduct
will subject an employee to "Immediate Termination," including
"Insubordination: including the failure to follow a direct order
from a supervisor/manager." (Def. SOF ¶ 12.)

### b. Plaintiff's Mispicks

Selectors are subject to various performance standards,
including "mispicks," which occur when employees incorrectly
select product for delivery to customers. (Def. SOF ¶¶ 32-33.)
In 2008, Plaintiff received disciplinary write-ups for mispicks
on eight separate occasions. (Def. SOF ¶ 35.) In 2009, Plaintiff
received disciplinary write-ups for mispicks on nine separate
occasions. (Def. SOF ¶ 36.) In 2010, Plaintiff received one
warning for mispicks. (Def. SOF ¶ 37.)

During Plaintiff's employment, US Foods' employees were
subject to progressive discipline for mispicks: (1) documented
discussion, (2) documented discussion, (3) written warning, (4)
second written warning, (5) one-day working suspension, (6)
three-day working suspension, and (7) termination. (Def. SOF ¶

34.) Disciplinary write-ups for mispicks were removed from an employee's file if more than one year passed without that employee receiving a subsequent disciplinary write-up for mispicks. (Def. SOF ¶ 34.) US Foods management removed mispick disciplinary write-ups from Plaintiff's employment file on a number of occasions. (Def. SOF ¶ 41.)

### c. Plaintiff's Termination

On August 26, 2010, Plaintiff was preparing a shipment that included one full pallet plus five additional boxes of frozen crab legs for a major US Foods customer. (Def. SOF ¶ 43.) Plaintiff retrieved a full pallet of crab legs from the warehouse freezer and added five boxes to the top. (Def. SOF ¶ 43.) The pallet contained approximately 25 boxes weighing 30 pounds each, for a total of 750 pounds stacked five feet high. (Def. SOF ¶ 45.) Each box sold, at that time, for $144.60, and the total value of the 25-box shipment was over $3,500. (Def. SOF ¶ 44.)

Plaintiff "brought out a skid that was leaning." (Pl. Dep. 54:13.) When Plaintiff's supervisor Jack Conway saw the leaning pallet, he instructed Plaintiff to rebuild it. (Def. SOF ¶ 48.) Instead of following Conway's direction, Plaintiff switched the leaning pallet with a new "better-looking" one without Conway's permission. (Def. SOF ¶ 49.) He added five boxes to the new

pallet, returned the leaning pallet to the freezer, and left work for the day. (Def. SOF ¶ 49.) Plaintiff did not follow Conway's instruction because he "was just really trying to get home" and because he thought his way was "better." (Def. SOF ¶ 50.) Plaintiff had previously rebuilt pallets as instructed, and he admits that leaning pallets are unsafe. (Def. SOF ¶ 52.)

Conway alleged that Plaintiff was insubordinate. (Pl. Counter SOF ¶ 3.) Conway told Robb Lebb, Director of Operations, that when Conway told Plaintiff to rebuild the pallet, Plaintiff responded that he would not rebuild it and instead would retrieve a new pallet. (Lebb Decl. ¶ 25.) Conway told Lebb that he then reiterated his instruction to rebuild the pallet and expressly told Plaintiff not to swap the leaning pallet with a new pallet. (Lebb Decl. ¶ 25.) Anthony, the union shop steward, also testified that Conway "said he told [Plaintiff] at least two, three times to rebuild that pallet." (Anthony Dep. 58:21-22.)

The day after the incident, Plaintiff met with Conway; his Union shop steward, William Anthony; and Rob Lebb. (Pl. Dep. 58:8-11.) Anthony testified that when Plaintiff was questioned about "why he did not do what he was told as far as rebuilding the pallet," Plaintiff said "his way was better . . . why should he rebuild the pallet when he can just go in the slot and take

6

another pallet out." (Anthony Dep. 18:14-21.) Anthony testified that Plaintiff "was told to specifically undo the pallet that he had placed in the dock" and that Plaintiff "thought it was easier for him to do it his way as opposed to the way he was being told to do it." (Anthony Dep. 18:23-19:5.) Anthony testified that Plaintiff "wasn't really remorseful in that meeting, no. Kept saying he indicated that he felt his way was better than the company's way. He did not show no remorse in that meeting, no. He actually thought he was not doing nothing wrong." (Anthony Dep. 60:21-61:2.)

Plaintiff was terminated on August 31, 2010 by US Foods for his refusal to rebuild the crab-leg pallet per Conway's direct orders. (Def. SOF ¶ 54.) The stated reason for the termination was insubordination and lack of remorse. (Pl. Counter SOF ¶ 28.) The decision to terminate Plaintiff's employment was made by Rob Lebb, Director of Warehouse Operations, and Rick Hutter, Regional Vice President of Operations, based on the information Lebb obtained about the incident. (Def. SOF ¶ 54.)

US Foods alleged that Plaintiff was not contrite. (Pl. Counter SOF ¶ 7.) At the meeting after the incident, Lebb perceived that Plaintiff did not express remorse for intentionally ignoring his supervisor's instructions. (Lebb Decl. ¶ 25.) Plaintiff continues to maintain that he did the

right thing on August 26, 2010 and that he was never insubordinate. (Def. SOF ¶ 62, Pl. Response to Def. SOF ¶ 62.)

At some point during the termination process, Anthony saw Conway and Lebb speak privately and "whatever occurred between their conversation, I don't know." (Anthony Dep. 36:25-37:1.)

Plaintiff grieved his termination through the Union. (Def. SOF ¶ 57.) US Foods denied Plaintiff's grievance, and the Union did not exercise its right to appeal the termination decision. (Def. SOF ¶ 63.)

During the grievance process, neither Plaintiff nor the Union ever raised allegations of race or FMLA discrimination. (Def. SOF ¶ 64.)

US Foods later terminated Plaintiff's supervisor Conway for theft and dishonesty. (Pl. Counter SOF ¶ 12.)

### d. Plaintiff's Work Environment

A group of African-American employees typically ate lunch together in the break room. (Pl. Counter SOF ¶ 77.) Plaintiff testified that Conway made jokes in front of him and other African-American employees asking them during their lunch break if they were eating chicken and grape soda, calling their lunch break the "BET lunch,"[1] and commenting about his African-American

---

[1] The "BET lunch" reference arose because the employees watched Black Entertainment Television. (Def. SOF ¶ 71.)

step-children listening to rap music. (Def. SOF ¶ 65.) Plaintiff also alleges that he heard Conway making racially-charged jokes during his lunch break, including jokes about African-Americans' genital sizes and watching basketball. (Def. SOF ¶ 66.) According to Plaintiff, all of Conway's comments occurred in the break room during the third lunch break. (Def. SOF ¶ 67.) These comments occurred "every day at lunchtime . . . with another black employee, [Conway] would go back and forth with." (Pl. Dep. 53:7-9.) Plaintiff "didn't want to hear" and "took offense." (Pl. Dep. 53:10.)

Selectors can choose between three different lunch break options and they are not required to eat lunch in the break room. (Def. SOF ¶ 68.) Plaintiff chose to attend the third lunch break. (Def. SOF ¶ 68.)

Plaintiff claims that Rob Lebb had a policy of telling African-American Selectors who were talking at work to stop, but allowing Caucasian Selectors to continue socializing. (Def. SOF ¶ 75.) On one occasion in 2006 or 2007, a supervisor told Plaintiff and another African-American Selector to stop talking and return to work but, on another occasion, Plaintiff witnessed the same supervisor permitting Caucasian Selectors to continue speaking. (Def. SOF ¶ 76.) Plaintiff admits that he should not have been talking during work hours. (Def. SOF ¶ 76.) Plaintiff

testified that he once saw another supervisor tell two African-American Selectors who were talking to return to work while allowing Caucasian Selectors to continue talking. (Def. SOF ¶ 77.)

Plaintiff claims that, on one occasion, he saw Caucasian Selectors sent home for misconduct and then called back by Conway. (Def. SOF ¶ 78.) He also claims that, on one occasion, an African-American Selector was sent home for misconduct and not called back, but he admits that he does not know whether the African-American Selector was called back and does not know what the African-American Selector did that caused him to be sent home. (Def. SOF ¶ 78.) Plaintiff also admits that the African-American Selector does not claim that he was sent home because of racial reasons. (Def. SOF ¶ 78.)

Plaintiff believes that African-American Selectors received more disciplinary write-ups than Caucasian Selectors and were disciplined for mispicks that they did not actually have. (Def. SOF ¶ 79.) He testified that he "know[s]" Caucasian Selectors were disciplined less often "by them not complaining like everybody else." (Pl. Dep. 200:16-17.) He admits this belief is based solely on perception, the speculation of other coworkers, and hearing certain names called over the warehouse intercom. (Def. SOF ¶ 79.) Plaintiff does not know for a fact that white

employees were disciplined less often. (Pl. Dep. 203:25-204:2)
He also has "no proof" that African-Americans were written up
for mispicks they did not have. (Pl. Dep. 204:10-13.) Plaintiff
is aware of at least one Caucasian Selector who received "a lot
of mispicks," and at least two Caucasian employees complained to
Plaintiff that they received mispick discipline that they did
not deserve. (Def. SOF ¶¶ 80-81.) Plaintiff also perceived that
he was disciplined for lateness when Caucasian employees were
not. (Pl. Dep. 51:12-15.)

US Foods never told Plaintiff that he was being terminated
or that his job was threatened because of his race. (Def. SOF ¶
85.)

### e. Plaintiff's FMLA Usage

US Foods has an FMLA policy stating "[it] is the policy of
US Foods . . . not to discharge or discriminate against any
employee exercising his or her rights under the Federal Family
and Medical Leave Act" and instructing employees who believe
that they have been treated unfairly to contact the Division
President or the President of Human Resources. (Def. SOF ¶ 22.)

US Foods never prevented Plaintiff from taking FMLA leave.
(Pl. Dep. 40:6-8.) Plaintiff began taking FMLA leave in 2006.
(Def. SOF ¶ 23.) He was granted an FMLA leave of absence
beginning on August 28, 2006, and he did not return to work for

the remainder of the year, thus taking more than 12 weeks of FMLA leave. (Def. SOF ¶ 23.) He returned to work at his same position on January 9, 2007. (Def. SOF ¶ 23.) In 2007, Plaintiff took eight days of intermittent FMLA leave. (Def. SOF ¶ 24.) In March 2009, Plaintiff was approved for intermittent FMLA leave from February 23, 2009 to July 22, 2009 and, during that time period, he took at least 11 FMLA leave days. (Def. SOF ¶ 25.) In July 2009, Plaintiff requested approval for another period of intermittent FMLA leave from July 23, 2009 through December 20, 2009, and he took at least 10 days of leave during that period. (Def. SOF ¶ 25.) During the first two months of 2010, Plaintiff took at least 14 FMLA leave days. (Def. SOF ¶ 26.) He was then approved to take intermittent FMLA leave from March 10, 2010 through September 9, 2010, and he took at least 18 more FMLA leave days during that period. (Def. SOF ¶ 26.)

Plaintiff's termination occurred during a designated FMLA period. (Pl. Counter SOF ¶ 2.) Plaintiff believed that his termination was based on his FMLA leave "because [he] was on FMLA." (Def. SOF ¶ 27.) Plaintiff's employment was never directly threatened because of his FMLA usage. (Pl. Response to Def. SOF ¶ 28.)

According to Plaintiff, Darwin Moore, another US Foods employee who was terminated and filed a lawsuit alleging FMLA

and NJLAD violations, heard Rob Lebb tell employees that they were working more because of their "FMLA buddies" and encouraged employees to call people who were on FMLA leave and tell them to return to work. (Pl. Counter SOF ¶ 14.) Moore also testified that Lebb once said "these motherfuckers on FMLA [were] the reason [employees were] working . . . overtime." (Pl. Counter SOF ¶ 15.) Moore testified that an employee named Pete had his job threatened when he took FMLA leave. (Pl. Counter SOF ¶ 27.) Plaintiff also heard Conway refer once to the FMLA as the "fraudulent medical leave act." (Pl. Counter SOF ¶ 25.)

### f. US Foods' Anti-Harassment Measures

US Foods maintains a non-discrimination policy that prohibits unlawful discrimination based on, <u>inter alia</u>, race. (Def. SOF ¶ 2.) US Foods also provides annual training to its employees, supervisors, and management on its non-discrimination policy, anti-harassment policy, and policy prohibiting retaliation. (Def. SOF ¶ 2.)

US Foods maintains a toll-free Check-In Line that employees may use to anonymously report unlawful discrimination, harassment, or retaliation. (Def. SOF ¶ 4.)

On his day of hire, Plaintiff signed a form acknowledging that he read and understood US Foods' Equal Opportunity Policy and agreed to "immediately report any perceived violations of

13

[that policy] to [his] supervisor or the Human Resources Department." (Def. SOF ¶ 5.)

US Foods' Selectors are represented by Local No. 169 of the Teamsters Union. (Def. SOF ¶ 6.) Unionized Selectors may lodge complaints or grievances through their union. (Def. SOF ¶ 7.) During Plaintiff's employment, William Anthony, an African-American man, was the union steward. (Def. SOF ¶ 8.)

Plaintiff never reported Conway's conduct to Human Resources. (Pl. Dep. 53:24-54:1.) He never called the Check-In line. (Pl. Dep. 257:17-19.)

**B. Plaintiff's Claims**

Plaintiff claims that his termination constituted unlawful interference with his FMLA rights and unlawful termination in retaliation for exercising his FMLA rights. Plaintiff also asserts claims for hostile work environment and unlawful termination under the NJLAD. Plaintiff seeks damages, including punitive damages.

**C. Jurisdiction**

The Court has original jurisdiction pursuant to 28 U.S.C. § 1331 for the claims arising under federal law and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) for the claims arising under state law.

14

**D. Parties' Arguments**

Defendant US Foods seeks summary judgment on all claims, arguing that: US Foods never denied Plaintiff FMLA leave to which he was entitled; Plaintiff cannot show a nexus between his FMLA leave and his termination; due to Plaintiff's failure to rebuild the leaning pallet, Plaintiff was not meeting US Foods' legitimate expectations; US Foods had a legitimate, non-discriminatory reason for the termination; the conduct allegedly supporting Plaintiff's hostile work environment claim is unsupported by admissible evidence and is legally insufficient; and US Foods had effective anti-harassment policies that Plaintiff did not use.

In opposition, Plaintiff argues that he has direct evidence of animus; a reasonable jury could conclude that his race and/or FMLA usage factored into US Foods' decision to terminate him; other employees engaged in similar or worse conduct without being terminated; his failure to rebuild the pallet should have been characterized as failure to follow instructions, not insubordination; a reasonable jury could find that the harassment he endured was severe and/or pervasive; and other persons in protected classes suffered harassment and discrimination.

In Reply, US Foods argues that the alleged evidence of discriminatory and anti-FMLA animus is unrelated to the decision-making process behind Plaintiff's termination, there is no direct evidence, and none of the comparator employees are similarly situated.

## III. ANALYSIS

### A. Standard of Review

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Essentially, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

Parties must support their factual positions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The Court must "draw all reasonable inferences in

favor of the non-movant." <u>Kowalski v. L & F Products</u>, 82 F.3d

1283, 1288 (3d Cir. 1996). The time for completing discovery

under the Court's scheduling orders expired and no party asserts

that additional discovery is needed.

**B. Plaintiff's Unlawful Termination Claims Fail**

Summary judgment will be granted on Plaintiff's unlawful

termination claims under both the FMLA and the NJLAD because

Plaintiff has not shown prima facie discrimination and because a

reasonable jury could not find that US Foods' reason for

Plaintiff's termination was pretextual.[2]

If Plaintiff presents direct evidence, then "the employer

must prove that it would have fired the plaintiff even if it had

not considered his [race or FMLA usage]." <u>Fakete v. Aetna, Inc.</u>,

308 F.3d 335, 338 (3d Cir. 2002). Direct evidence is "evidence

of discriminatory attitudes about [FMLA or race] that were

causally related to the decision to fire [Plaintiff]." <u>Glanzman</u>

---

[2] The Court will analyze Plaintiff's unlawful termination claims
together because, under both the FMLA and the NJLAD, the Court
examines whether the employer had a legitimate, non-
discriminatory basis for the termination. <u>See, e.g.</u>, <u>Brown v. DB
Sales, Inc.</u>, Civ. 04-1512, 2005 WL 3591533, at *6 (E.D. Pa. Dec.
29, 2005) ("If Plaintiff is able to successfully establish prima
facie cases of both race discrimination claim and FMLA
retaliation, both claims will be analyzed using the <u>McDonnell
Douglas</u> three-stage burden shifting framework"); <u>Sarnowski v.
Air Brooke Limousine, Inc.</u>, 510 F.3d 398, 403 (3d Cir. 2007)
("In applying the [NJ]LAD, . . . courts use the same burden-
shifting framework . . . adopted in <u>McDonnell Douglas</u>").

v. Metro. Mgmt. Corp., 391 F.3d 506, 512 (3d Cir. 2004).

"[S]tatements made by non-decision makers or by a decision maker unrelated to the decisional process itself are not direct evidence." Id. at 513 (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989)). In Glanzman, for example, the Third Circuit held that the plaintiff's supervisor's statement to two of her coworkers that he "wanted to fire her and 'replace her with a young chippie with big tits'" was direct evidence. Glanzman, 391 F. 3d at 510.

Plaintiff has not produced any evidence of discriminatory attitudes causally related to the termination decision. For example, he has not adduced any evidence of comments from Conway, Lebb, or Hutter that Plaintiff should be terminated because of his race or his FMLA usage. Even if Plaintiff had produced direct evidence, US Foods has shown, as discussed infra, that it would have terminated Plaintiff because of his insubordination and his lack of remorse.

Absent direct evidence, "[i]f circumstantial evidence of [FMLA or race] discrimination is used, then the proponent of the evidence must satisfy the three-step test of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Glanzman, 391 F.3d at 512.

To establish a prima facie discriminatory discharge case under the McDonnell Douglas framework in New Jersey, the

plaintiff must demonstrate: "(1) that plaintiff is in a protected class; (2) that plaintiff was otherwise qualified and performing the essential functions of the job; (3) that plaintiff was terminated; and (4) that the employer thereafter sought similarly qualified individuals for that job." Victor v. State, 203 N.J. 383, 409 (2010). Plaintiff "is African–American, which is a protected class," and US Foods fired him. Wilcher v. Postmaster Gen., 441 F. App'x 879, 881 (3d Cir. 2011). But Plaintiff has not established the third element of the prima facie case, i.e., that he was performing the essential functions of the job. Plaintiff admitted that he did not follow Conway's order to fix the leaning pallet, leaning pallets are unsafe, and insubordination is a terminable offense. Therefore, Plaintiff has not established a prima facie discriminatory discharge case.

The prima facie requirements for an FMLA retaliation claim are similar: "(1) he took an FMLA leave, (2) he suffered an adverse employment decision, and (3) the adverse decision was causally related to his leave." Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004). Plaintiff was on an intermittent FMLA leave period when he was terminated and his termination is an adverse employment decision. Plaintiff has not, however, shown that there was any connection between his termination and his FMLA usage. Plaintiff has been using FMLA

leave intermittently since 2004 without any adverse employment impacts, and "the Court is persuaded by evidence of Defendant's history of approving the Plaintiff's . . . FMLA leave that it did not act with discriminatory motive in firing the Plaintiff." Yashenko v. Harrah's NC Casino Co., LLC, 352 F. Supp. 2d 653, 662 (W.D.N.C. 2005), aff'd, 446 F.3d 541 (4th Cir. 2006). Plaintiff's unlawful termination claims therefore fail because Plaintiff has not established prima facie cases under the NJLAD or FMLA.

Even if Plaintiff had established a prima facie case of FMLA or race discrimination, Plaintiff's claims would not survive the remaining steps in the McDonnell Douglas analysis. After the prima facie step, "the burden shifts to the defendant to rebut the proof of discrimination by articulating some legitimate, nondiscriminatory reason for the employee's discharge." Jalil v. Avdel Corp., 873 F.2d 701, 706 (3d Cir. 1989). The plaintiff may then show that "the alleged reasons proffered by the defendant were pretextual and that the defendant intentionally discriminated . . . ." Id. To show pretext, Plaintiff must submit evidence which: "1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder

to infer that discrimination was more likely than not a
motivating or determinative cause . . . ." <u>Fuentes v. Perskie</u>,
32 F.3d 759, 762 (3d Cir. 1994).

A reasonable jury could not conclude that Defendant
fabricated the reasons, <u>i.e.</u>, insubordination and lack of
remorse, for the termination. Plaintiff has admitted the
following facts: the crab-leg pallet was leaning; leaning
pallets are unsafe; his supervisor Jack Conway directed him to
rebuild the pallet; instead of following Conway's order,
Plaintiff switched the leaning pallet with a different one;
insubordination includes the failure to follow a direct order;
and insubordination subjects an employee to immediate
termination. Based on Plaintiff's admissions, there is no
factual dispute that Plaintiff was insubordinate and that his
insubordination subjected him to termination.

Plaintiff argues that he apologized to Conway at the
meeting after the incident and, therefore, there is a disputed
issue of material fact as to whether he showed remorse. The
Court finds that there is no factual dispute because, in his
statement of facts, Plaintiff stated that he "was never
insubordinate." (Pl. Response Def. SOF ¶ 62.) Plaintiff's union
shop steward testified that, at the meeting after the crab-leg
incident, Plaintiff "wasn't really remorseful . . . . Kept

saying he indicated that he felt his way was better than the company's way. He did not show no remorse in that meeting, no. He actually thought he was not doing nothing wrong." (Anthony Dep. 60:21-61:2.) Moreover, Defendant perceived that Plaintiff was not remorseful, and "[w]hat is at issue is the perception of the decision maker, not the plaintiff's view . . . ." Brown v. DB Sales, Inc., Civ. 04-1512, 2005 WL 3591533, at *5 (E.D. Pa. Dec. 29, 2005). Even if Defendant wrongfully perceived that Plaintiff was not remorseful, that erroneous perception would not show that Defendant acted with discriminatory intent.[3]

Plaintiff also argues that his conduct should be characterized as failure to follow instructions, which is not a terminable offense, rather than insubordination. Frank Keyser, the day warehouse manager who was not involved with Plaintiff's termination, testified that "failure to follow instruction would be if you are instructed to do something, to fix something, and you proceed not to do it . . . insubordination would be if you are told to do it, and you start getting hostile with me, refusing to do it . . . ." Plaintiff's counsel asked Keyser to

---

[3] Moreover, US Foods notes that it was lenient in disciplining Plaintiff for his mispick record. US Foods removed mispick disciplinary letters from Plaintiff's file and offered him training opportunities. This leniency shows a lack of discriminatory animus.

classify the misconduct when an employee "is advised or told or instructed to unload or repackage a pallet, and in his mind he thinks it is better to restock and pull out a new, a different package." (Keyser Dep. 64:10-14.) Keyser responded that "[j]ust in that scenario you gave me, I would say that would be failure to follow instructions." (Keyser Dep. 64:19-21.) Plaintiff's counsel did not mention a leaning pallet in his hypothetical. Defendant's counsel asked, "If a warehouse employee had a leaning skid and was told to rebuild that skid, and instead of rebuilding that skid, took it upon himself to return that skid back to the freezer and take a new skid, would that be considered insubordination?" (Keyser Dep. 97:18-24.) Keyser responded, "Yes." In other words, when Keyser was presented with a hypothetical accurately reflecting the present facts, he classified Plaintiff's behavior as insubordination.

Moreover, the Rules specify that insubordination "includ[es] the failure to follow a direct order from a supervisor/manager." (Def. SOF ¶ 12.) It is undisputed that Conway ordered Plaintiff to rebuild the leaning pallet and that Plaintiff did not do so. The record supports US Foods' decision to classify Henson's conduct in the crab-leg incident as insubordination.

Moreover, even if US Foods did mistakenly classify Plaintiff's conduct as insubordination, Plaintiff has not adduced any evidence indicating that discriminatory animus was a factor behind such a mistake. "To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes v. Perskie, 32 F.3d at 765. Anthony, the union shop steward, implied that the classification may have been erroneous: When asked the reason for Plaintiff's termination, Anthony, testified that his "interpretation" was that Plaintiff "failed to follow instructions, but insubordination, I don't know." (Anthony Dep. 37:11-18.) But when he was asked whether race had an effect on Plaintiff's discipline, Anthony testified "No. No. Not here, no. Not in front of me . . . no, and I'm an African-American." (Anthony Dep. 38:25-39-2.) There is ample evidence supporting US Foods' decision to classify Plaintiff's behavior as insubordination and, even if the classification was inappropriate, there is no evidence indicating that the classification was based on discriminatory animus.

Plaintiff attempts to show pretext by arguing that
similarly situated employees were not terminated despite conduct
that was insubordinate or otherwise problematic. "[T]o be
considered similarly situated, comparator employees must be
similarly situated in all relevant respects . . . tak[ing] into
account factors such as the employees' job responsibilities, the
supervisors and decision-makers, and the nature of the
misconduct engaged in." Wilcher, 441 F. App'x at 882 (citations
omitted). In terms of the misconduct, the comparators must have
"engaged in similar conduct without such differentiating or
mitigating circumstances as would distinguish their conduct or
the employer's treatment of them." Opsatnik v. Norfolk S. Corp.,
335 F. App'x 220, 223 (3d Cir. 2009).

None of Plaintiff's examples are similarly situated in all
relevant respects. Plaintiff cites employees whose misconduct
was wholly dissimilar, including employees who were dishonest,
falsified company documents, damaged company property, testified
positive for controlled drug substances, or missed work days. At
oral argument, Plaintiff emphasized that these comparators are
appropriate because their conduct was worse than Plaintiff's
conduct, but their discipline was less severe. Plaintiff has not
cited any case law allowing comparators whose misconduct was
wholly dissimilar. Even if the comparators were appropriate,

there is some distinguishing evidence. For example, the employee who tested positive for controlled drug substances "was reinstated after he voluntarily enrolled in a rehabilitation program and in light of the fact that he had been with the company for more than 15 years without any other disciplinary action in his personnel file." (Def. Responses to Pl. Counter SOF ¶ 49.) Furthermore, even if Plaintiff "has identified several individuals who committed violations of either such frequency or severity that they could have been discharged . . . these comparators do not create a genuine issue of material fact. [Plaintiff]'s comparator evidence does not cast doubt on [Defendant]'s otherwise satisfactory explanation for his termination." Opsatnik, 335 F. App'x at 224.

Plaintiff also cites examples of employees who were insubordinate by refusing to complete work that a supervisor had assigned to them. The insubordinate comparators are also inapt because none of them refused to comply with an order, left an unsafe condition, and lacked remorse. For example, Lebb explained that one of the employees was remorseful during the grievance process: he "realized what he had done was inappropriate and . . . was very, very apologetic for what he had done and then was honest of what happened so we took it into consideration and we reinstated him." (Lebb Dep. 27:9-15.) The

other insubordinate comparator "came back and said I'll do the work I shouldn't of refuse it, let me have the work . . . ." (Lebb Dep. 17:9-11.) In both of these examples, therefore, US Foods management perceived that the insubordinate employee was remorseful. By contrast, Plaintiff continues to insist that his behavior was appropriate. Plaintiff's comparator evidence is inadequate to show pretext.

Plaintiff also attempts to show pretext by citing anti-FMLA and racially discriminatory comments, such as Conway's comment about African-American employees eating grape soda and chicken or Conway's reference to the FMLA as the fraudulent medical leave act. These comments do not show pretext because "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992). Conway's remarks are offensive, but a reasonable jury could not find that the comments were especially directed at Plaintiff or that they indicate that Conway planned to terminate African-American or FMLA employees more frequently.

In Moore v. U.S. Foodservice, Civ. 11-2460, 2013 WL 5476405 (D.N.J. Sept. 30, 2013), another US Foods employee, Darwin Moore, brought claims for FMLA interference and retaliation

27

against US Foods. The Moore court examined some of the same evidence of anti-FMLA sentiment, including Moore's contentions that

> At pre-shift meetings, . . . Robert Lebb, Director of Operations, would tell the employees they were working more because of their "FMLA buddies" and encouraged employees to call those out on FMLA, to tell them to come to work. Mr. Lebb's other pejoratives included "FMLA brothers" and that "these motherfuckers on FMLA [were] the reason [employees were] working . . . overtime." Mr. Lebb specifically referred to [Defendant] needing to expend resources for overtime because employees were utilizing FMLA.

Id. at *8, n.4 (citations to Moore dep. omitted). The Moore court held that "there is no support in the record for Plaintiff's claim that Defendant terminated his employment in retaliation for taking FMLA leave. Rather, Plaintiff exceeded the number of unexcused absences allowed by his employer, . . . which ultimately resulted in Plaintiff's termination." Id. at *8. Similarly, in the present case, Plaintiff has not adduced any evidence that discriminatory or retaliatory animus motivated Defendant's decision to terminate him.

Plaintiff argues that "[a] reasonable jury can also discredit the asserted reason for termination because the Manager who made the allegation was Jack Conway." (Pl. Opp'n at 10.) Plaintiff asserts that Conway is not credible because he

was terminated for dishonesty and theft and showed discriminatory animus based on Plaintiff's race and FMLA usage.

The Court finds that a reasonable jury could not find that Conway's allegations surrounding the insubordination incident were false: Plaintiff admits that he disobeyed Conway's order and continues to argue that his conduct was appropriate. The relevant facts that formed the basis of Plaintiff's termination, i.e., Plaintiff's refusal to follow a direct order and his lack of remorse, are not disputed. Likewise, Plaintiff's poor work history of multiple citations for mispicks is not disputed, none of which turns on Conway's credibility. At oral argument, Plaintiff's counsel argued that Conway was a decisionmaker in the termination process and that Conway's private meeting with Lebb indicates the possibility that Conway advocated for termination based on discriminatory animus. There is no evidence in the record regarding what Lebb and Conway discussed and the mere fact that they met does not create a disputed issue of material fact, especially when Plaintiff has admitted the facts that show insubordination.

The Court will grant summary judgment to Defendant US Foods on Plaintiff's NJLAD and FMLA unlawful retaliation claims because Plaintiff failed to establish prima facie cases of discrimination for either claim and, even if he had passed the

prima facie threshold, he has not shown that US Foods' stated non-discriminatory reasons for the termination, _i.e._, insubordination and lack of remorse, were pretextual.

### C. Plaintiff's FMLA Interference Claim Fails

Section 2615(a)(1) of the FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). "In order to assert a claim of interference, an employee must show that he was entitled to benefits under the FMLA and that his employer illegitimately prevented him from obtaining those benefits." Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 401 (3d Cir. 2007). Plaintiff has not shown that US Foods ever denied him FMLA leave to which he was entitled.

Plaintiff also argues that the termination constituted interference with his FMLA rights because he was on an intermittent FMLA leave period when the termination occurred. But "'[t]he FMLA is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA claim.'" Brown v. DB Sales, Inc., Civ. 04-1512, 2005 WL 3591533, at *11 (E.D. Pa. Dec. 29, 2005) (quoting Cohen v. Pitcairn Trust

<u>Co.</u>, 2001 U.S. Dist. LEXIS 10876, at *30 (E.D. Pa. June 20, 2001)). As discussed above, US Foods had a legitimate, non-discriminatory reason for terminating Plaintiff, which has not been discredited by evidence that a reasonable factfinder could determine to be pretextual. That Plaintiff was on intermittent leave status when he was insubordinate at work by refusing to follow the repeated orders of his supervisor does not shield him from the termination decision. His refusal to follow the orders and his lack of remorse had nothing to do with his intermittent FMLA leave status.

The Court will grant summary judgment on Plaintiff's FMLA interference claim.

### D. Plaintiff's Hostile Work Environment Claim Fails

To establish an NJLAD hostile work environment claim, Plaintiff must show that "(1) the conduct complained of was unwelcome; (2) that it occurred because of the plaintiff's inclusion in a protected class under the LAD; and (3) that a reasonable person in the same protected class would consider it sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile, or offensive work environment." <u>El-Sioufi v. St. Peter's Univ. Hosp.</u>, 382 N.J. Super. 145, 178 (App. Div. 2005). "[N]ot every offensive remark, even if direct, is actionable . . . epithets or comments

which are merely offensive will not establish a hostile work environment claim." Id. (citations omitted). To determine whether an environment is hostile or abusive, the Court must "look[] at all the circumstances, which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a merely offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (citations omitted). "Neither rude and uncivil behavior nor offensive comments alone create a hostile work environment under the LAD." Shaw v. FedEX Corp., A-1634-10T3, 2012 WL 3116722, at *5 (N.J. Super. Ct. App. Div. July 20, 2012).

Plaintiff's hostile work environment claim is based on (1) the comments of his supervisor Jack Conway, and (2) Plaintiff's perception that African-American employees were treated less favorably than Caucasian employees because African-Americam employees were not permitted to socialize during work hours and were targeted for mispick discipline.

Conway's comments are insufficient to establish a hostile work environment claim. Plaintiff alleges that Conway made comments during the third lunch break in which Conway joked about African-Americans' genital sizes and watching basketball, asked the employees if they were eating chicken and grape soda,

called the lunch break the "BET lunch" in reference to Black Entertainment Television, and made comments about Conway's own African-American stepchildren listening to rap music.

Plaintiff has not alleged that these comments interfered with his work performance and, therefore, he fails to establish an essential element of a hostile work environment claim. Moreover, Plaintiff has acknowledged that the comments occurred during the third lunch break; that many of the comments stemmed from Conway's banter with another employee, who is African-American; that Plaintiff had multiple lunch break options; and that Plaintiff was not required to eat his lunch in the break room. While Conway's comments could certainly be perceived as offensive, a reasonable jury would not find that these lunchroom comments and banter created a work environment that was sufficiently severe or pervasive to alter the conditions of employment for Plaintiff as an African-American.

Plaintiff has not adduced any evidence to support his claim that African-American employees were disciplined more frequently. For example, Plaintiff testified that he "know[s]" Caucasian Selectors were disciplined less often "by them not complaining like everybody else." (Pl. Dep. 200:16-17.) But he admits this belief is based solely on perception, the speculation of other coworkers, and hearing certain names called

over the warehouse intercom. (Def. SOF ¶ 79.) He has "no proof"
that African-Americans were written up for mispicks they did not
have. (Pl. Dep. 204:10-13.) Plaintiff has not adduced competent
evidence to support his claims of disparate treatment.
"Perception like speculation and suspicion cannot support a
cause of action." Mandel v. UBS/PaineWebber, Inc., 373 N.J.
Super. 55, 79 (App. Div. 2004).

Furthermore, US Foods had various anti-harassment
mechanisms, and the existence of such mechanisms can mitigate an
employer's liability. The New Jersey Supreme Court has held that

> a plaintiff may show that an employer was negligent by
> its failure to have in place well-publicized and
> enforced anti-harassment policies, effective formal
> and informal complaint structures, training, and/or
> monitoring mechanisms. We do not hold . . . that the
> presence of such mechanisms demonstrates the absence
> of negligence. However, the existence of effective
> preventative mechanisms provides some evidence of due
> care on the part of the employer.

Lehmann v. Toys R Us, Inc., 132 N.J. 587, 621 (1993); cf. Gaines
v. Bellino, 173 N.J. 301, 320 (2002) ("A defendant is entitled
to assert the existence of an effective anti-sexual harassment
workplace policy as an affirmative defense to vicarious
liability"). Multiple factors can show an employer's commitment
to preventing a hostile work environment:

> A company that develops policies reflecting a lack of
> tolerance for harassment will have less concern about

34

> hostile work environment or punitive damages claims if its good-faith attempts include periodic publication to workers of the employer's anti-harassment policy; an effective and practical grievance process; and training sessions for workers, supervisors, and managers about how to recognize and eradicate unlawful harassment.

Cavuoti v. New Jersey Transit Corp., 161 N.J. 107, 121 (1999).

Evidence in the record shows that US Foods satisfied many of these factors. US Foods had an anti-discrimination policy, annual training, and remedial mechanisms for reporting complaints. It also had a toll-free Check-In Line that employees could use to anonymously report unlawful discrimination, harassment, or retaliation. (Def. SOF ¶ 4.) On his day of hire, Plaintiff signed a form acknowledging that he read and understood the Equal Opportunity Policy and agreed to "immediately report any perceived violations . . . to [his] supervisor or the Human Resources Department." (Def. SOF ¶ 5.)

US Foods cited the declaration of William Nunan, the Human Resources Manager for US Foods' Philadelphia Division to show that US Foods provides annual training on its non-discrimination, anti-harassment, and anti-retaliation policies to its employees, supervisors, and management. (Nunan Decl. ¶ 6.) Plaintiff appeared to deny this fact because "management was aware of Jack Conway's harassment / retaliation." (Pl. Response Def. SOF ¶ 2.) Plaintiff did not provide any evidence indicating

35

that US Foods did not provide these annual trainings. At oral

argument, Plaintiff questioned the training but, again, did not

cite to any evidence in the record. Plaintiff has not adduced

any evidence indicating that the complaint mechanisms were

ineffective, that complaints were ignored, that the policies

were not published, or that the training sessions were

inadequate or nonexistent.

Plaintiff admits that he did not use any of US Foods' anti-

harassment programs and remedial measures. This failure to use

the remedial mechanisms, along with the other factors discussed

supra, supports granting summary judgment for US Foods. See

Gibson v. State - Office of Attorney Gen., A-1426-05T2, 2007 WL

737748, at *14 (N.J. Super. Ct. App. Div. Mar. 13, 2007) ("As

there is ample evidence . . . demonstrating defendants created

and provided . . . avenues to address and remedy violations, and

that plaintiff failed to avail herself of those available

remedies . . ., the motion judge did not err when he found that

the complaint should be dismissed as a matter of law"); Ahmed v.

Interstate Mgmt. Co., Civ. 11-683, 2012 WL 3038523, at *18

(D.N.J. July 25, 2012) (granting summary judgment on NJLAD

hostile work environment claim because "[a]s Defendant had

effective anti-harassment policies in place and responded to

complaints brought to its attention, a reasonable jury could not

find Defendant liable on a hostile work environment claim based on allegedly discriminatory comments made by his coworkers that Plaintiff did not report").

Plaintiff argues that Barnes v. Office Depot, Inc., Civ. 08-1703, 2009 WL 4133563 (D.N.J. Nov. 24, 2009), stands for the proposition that "[w]hen a defendant contends that it had in place policies and procedures addressing anti-harassment, the Court has held that whether said policies or responses constituted a good faith effort to comply with a statute is something that is best left to the jury." (Pl. Opp'n at 23.) The Barnes court found, however, that "the record indicates unwillingness to respond to complaints submitted by the plaintiff by high level Office Depot employees" and, therefore, that "[w]hether Office Depot made a good faith effort to comply with Title VII and to respond to complaints made by Ms. Barnes is a question of fact best left to a jury." Barnes v. Office Depot, 2009 WL 4133563, at *15. In this case, there is quite plainly no evidence that plaintiff made any complaints and no evidence that US Foods was unresponsive to others' complaints.

Plaintiff cites Shepherd v. Hunterdon Developmental Center, 174 N.J. 1 (2002), in which the New Jersey Supreme Court reversed summary judgment on a hostile work environment claim, and argues that "[t]he facts here far exceed what occurred in

_Shepherd_." (Pl. Opp'n at 18.) In _Shepherd_, the plaintiffs had
supported a lawsuit that their coworkers had brought against
their supervisors. The _Shepherd_ plaintiffs argued that, when
their coworkers' lawsuit began, the supervisors "began a pattern
of ill treatment and ultra-critical supervision," including
statements that the supervisors "were going to watch everything
that you . . . do" and that "what goes around comes around and
you will be sorry for not writing better statements for us
concerning the lawsuit." _Id._ at 9. The plaintiffs sent complaint
letters to the superintendent and filed discrimination
complaints with the Department of Human Services. The teachings
of _Shepherd_ are not applicable to the present case, where
Plaintiff never filed any complaints regarding racial
discrimination and where Plaintiff has not adduced any evidence
indicating that US Foods' supervisors threatened him.

A reasonable jury could not find that Plaintiff was subject
to a hostile work environment because (1) while Conway's
comments were offensive, they did not impair Plaintiff's work
performance, (2) Conway's comments occurred during an optional
lunch break and were primarily in the context of banter with
other African-American employees, (3) Plaintiff lacks competent
evidence supporting his perception that African-American
employees were subject to different disciplinary and deportment

standards, and (4) Plaintiff failed to use US Foods' anti-harassment remedial measures and has not shown that US Foods' trainings were inadequate. The Court will grant summary judgment on Plaintiff's hostile work environment claim.

## V. CONCLUSION

The Court will grant summary judgment for Defendant on Plaintiff's claims for unlawful interference with his FMLA rights, unlawful termination in retaliation for exercising his FMLA rights, hostile work environment under the NJLAD, and unlawful termination under the NJLAD. Because summary judgment will be granted on all claims, final judgment is entered for Defendant. Because no named Defendants remain in this action, the Court will instruct the Clerk of Court to close this matter.


**November 19, 2013**          **s/ Jerome B. Simandle**
Date                           JEROME B. SIMANDLE
                               Chief U.S. District Judge